UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Krista B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50027 |
| | ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a long-running Social Security disability benefits case with two ALJ decisions now on record and with the finish line unfortunately still not in sight. Plaintiff alleges she is disabled based on mental health impairments and fibromyalgia.

To recap, plaintiff filed a Title II application in 2014. An administrative law judge ("ALJ") held a hearing in 2016 and, a month later, issued a 12-page decision finding plaintiff not disabled. A key rationale was that plaintiff's problems (*e.g.* trouble concentrating for sustained periods) were mainly caused by her drawn-out divorce proceedings. We will label this the "divorce theory" as a shorthand (the ALJ never described it precisely this way) because it will be discussed in some detail below. Plaintiff eventually appealed the ALJ's first decision to this Court, but the parties agreed to a voluntary remand before briefing was completed. On remand, the same ALJ conducted a second administrative hearing in the fall of 2018 and then, two weeks later, issued a 30-page decision finding plaintiff not disabled. Although the decision grew considerably in length, it contained the same basic rationales.

1

Plaintiff's main argument for a remand is that the ALJ erred in rejecting multiple opinions from Dr. Marianne Geiger, a psychiatrist who treated plaintiff over a 17-year period. Based on this and other arguments, the Court finds that the case must be remanded.

## BACKGROUND

Plaintiff was born in 1972. In 2001, she began treating with Dr. Geiger whom she saw up until the time of the hearing, with some treatment gaps, one of which was a several-year period roughly from 2010 to 2013. Neither the parties, nor the ALJ, have included a summary setting forth the precise frequency of plaintiff's visits with Dr. Geiger. It appears to be in the range of once a month to once every two to three months. Dr. Geiger's role was medication management. Although her notes summarize some discussions with plaintiff about her life problems, Dr. Geiger was not engaging in traditional therapy sessions. This role was played, for some of this time period, by Jan Benedict, a social worker therapist working with Dr. Geiger.[1]

On October 20, 2014, plaintiff was examined by psychologist Julie Harris who prepared a report in which she diagnosed plaintiff with major depressive disorder. R. 338. She noted in the report that plaintiff had been separated for ten months from her husband and was living with her parents; that she worked for a company from 1999 to 2006 but was terminated for post-partum depression; and that she had "recently worked as a dental assistant for about four months, and she reported crying frequently on the job and they had suggested she leave and come back when she is well." R. 336-37. The report also contained the following statement which arguably is germane to the ALJ's divorce theory:

> The claimant reported having depression off and on since the mid to late 1990s.
> She reported an onset of another bout of depression last November. She struggled

---

[1] The administrative record contains multiple exhibits containing Dr. Geiger's and Ms. Benedict's treatment notes. *See* Ex. 5F (130 pages); Ex. 8F (52 pages); Ex. 13F (47 pages); Ex. 18F (16 pages); Ex. 22F (16 pages); Ex. 26F (10 pages).

to communicate exactly what the cause of this was, but she denied that it is
specifically related to her current life stressors.

R. 337. The Court will discuss this statement below. In a separate medical source statement, Dr.

Harris opined that plaintiff had no limitations in any area of functioning. R. 340-41.

The first administrative hearing was held in March 2016. No medical expert testified. The

ALJ began the questioning by asking the "freeform" (ALJ's word) question why plaintiff could

not work. Plaintiff stated that she had a "very hard time with like everyday tasks, just trying to

get through the everyday, just stuff you do at home." R. 40. She stated that she sometimes would

have a good day, but it would be followed by "many bad days." R. 41. The ALJ's second

question was about the divorce theory. The following exchange took place:

> Q Ms. [B], one of the things I noticed reading through the records with
> Dr. Geiger as well as the therapist, is that you know, a prevailing theme you know
> in all the treatment notes was, the difficulty you were having going through first a
> separation, then divorce with your husband, and the impact that was having on
> raising your son and these things are probably sometimes very difficult to
> separate, but I'm interested in your perspective on you know, since your new
> alleged onset date of 2013, how much of what you've been dealing with in terms
> of major depression relates to the situation that you were going through at the
> time in terms of separating from and divorcing from your husband and how much
> of it relates to a mal-condition that's there irrespective of that? Do you know what
> I mean by that?
>
> A Are you asking me like the difference between like necessarily my
> illness versus going through a divorce, is that what you're kind of—
>
> Q Yes, and I guess a simple way to put it is, how much of your
> depression was related to the situation that you were going through as opposed to
> a condition that would be there regardless of that situation in your life?
>
> A I don't think that the divorce itself has the impact on my mental
> condition I think as many would think. I think getting out of the situation that I
> was in, has helped. I don't know if that makes sense, but getting away from an—a
> bad environment it's been to me more of a good thing. I don't know if that makes
> sense but—
>
> Q Is—are things all resolved now in your divorce in terms of a parenting
> agreement or is it still ongoing and—

3

A   The divorce is still going, the parenting agreement, that's all been signed and done for almost two years. [S]o, that's you know, the main thing was to make sure that everything stayed okay for our son.

R. 41-42. This colloquy will also be discussed blow.

After asking these two questions, the ALJ turned the questioning over to plaintiff's counsel who explored various topics. Plaintiff testified that she and her then ten-year-old son had been living with her parents for two and a half years while she was separated from her husband. She lost 60 pounds in an effort to improve her health. Counsel then asked about plaintiff taking online college classes at Southwest Tech College. Plaintiff testified that she was studying "Cancer Information Management" and stated that she had to drop one class because she "couldn't keep up" with the readings. R. 45. But she got As and a B in her other classes. She described her workload for these courses as follows: "Probably maybe like six hours a day maybe, give or take, or like maybe one day I would have a really, really good day and I can do something and then for like two or three days it's impossible to read, concentrate." *Id.* Her schedule was flexible in that she was given a couple weeks to complete assignments.

Plaintiff testified that took her son to school and picked him up but didn't like going out in the public. She had panic episodes where it took "anywhere from an hour to the rest of the day until [she] can figure out a way either to calm [herself] down or the situation goes away." R. 53. She was taking Zoloft, Wellbutrin, Gabapentin, and Lorazepam, all of which were prescribed by Dr. Geiger. She had problems concentrating and staying on task. Her mother and father came over to help "quite a few times during the week." R. 54. She slept two to four hours a night, which caused a "very vicious cycle" where she could not function during the day because of the lack of sleep and then she would get anxious because she couldn't get things done. R. 56.

On April 27, 2016, the ALJ issued a written decision finding that plaintiff could do the full range of work with some limitations to address her psychological problems. The decision rested on several rationales, including that plaintiff's mental health treatment had been "generally successful" in controlling her symptoms (as evidenced by, among other things, no hospitalizations); that her depression over the last few years "was related more to her situation in separating and divorcing her husband"; that she was able to take college classes online and hoped to go back to work someday; that she was able to do daily activities such as getting her son ready for school, packing his lunch, and then returning home to do a load of laundry. R. 22-23.

As for the medical opinions, the ALJ rejected Dr. Geiger's opinions, which consisted at this time of two RFC mental health questionnaires (Exs. 9F and 14F). The ALJ noted two main reasons. First, the ALJ observed that the second questionnaire from March 2016 was "simply" a photocopy of the first questionnaire from May 2015, which Dr. Geiger had merely re-signed. The ALJ believed that, even if there was no change in plaintiff's condition in this 10-month period, Dr. Geiger should have explained why there was a "lack of response to treatment" during this period. R. 23. Second, the ALJ found Dr. Geiger's statement that plaintiff had four or more episodes of decompensation was "not worthy of great consideration" when "there were no hospitalizations." R. 23-24.

On August 16, 2016, after the ALJ's ruling, Dr. Geiger submitted a two-page letter responding to the ALJ's criticisms of her opinions. Ex. 15F ("I am writing this letter to provide additional detail that may not have been obvious in the review of her medical records."). Dr. Geiger commented on, among other things, the divorce theory, the lack of hospitalizations, the type of treatments being tried, and the fact that there were some normal findings in the record.

As noted above, plaintiff eventually appealed the ALJ's decision to this Court. Case No. 17-50190. In her opening brief, she plaintiff raised some of the same arguments she is now raising, including arguments criticizing the ALJ's rejection of Dr. Geiger's opinions and arguments about inadequate attention given to plaintiff's inability to sustain concentration. *See* Dkt. #14. Before the Government filed a response brief, the parties agreed to a remand, and this Court issued no ruling on the merits. *See* Dkt. #21.

On remand, the Administration obtained a second consultative exam. On October 20, 2017, psychologist Peter Thomas examined plaintiff and prepared a report. Ex. 23F. He diagnosed her with persistent depressive disorder. He noted that she had a "very sporadic" work history and was an only child who relied "upon her parents for much her care of her home and self." R. 1269. He concluded that her communication and intellectual abilities were adequate, although she was "only able to recall 5 digits forward and 3 digits backwards," thus suggesting "she may experience some difficulties with concentration." *Id.*

On September 13, 2018, the second hearing was held before the same ALJ. Again, no medical expert testified. Plaintiff testified about some of the same issues as she did in the first hearing. She testified that she had "a lot of ups and downs" since 2000. R. 856. She described how she had some problems getting along with coworkers and would get "agitated and emotional" with supervisors. R. 857. Her biggest hurdle was "doing the same thing over and over" because she would get bored and lose concentration. R. 858.

On September 26, 2018, the ALJ issued a 30-page decision finding plaintiff not disabled. The much longer opinion (30 pages versus 12) might suggest there was more analysis or new rationales. However, for the most part, they are the same. The extended length is mostly a mirage due to the ALJ's somewhat hard-to-follow decision to bifurcate the case into two time periods

tied to the date last insured of March 31, 2016 and the filing of a separate Title XVI application. In short, the ALJ basically repeated the same analysis twice based on the claim that plaintiff's physical impairments worsened somewhat after this date, thus justifying an RFC limited to light work rather than full work. The Court finds this double analysis confusing because it is not clear that plaintiff's medical condition really changed in a material way. In any event, because none of the arguments here turn on the bifurcation aspect of the decision, we will not further discuss it.

**DISCUSSION**

Plaintiff raises the following main arguments for a remand: (1) the ALJ erred in rejecting Dr. Geiger's opinions; (2) the AJL erred in rejecting evidence of crying; and (3) the ALJ rendered an improper symptom determination (sometimes referred to as the "credibility determination"); and (4) the ALJ erred in evaluating Listing 12.04. Interspersed within these arguments are recurring sub-arguments. After considering these arguments, the Court agrees that a remand is warranted. However, the Court will not discuss these arguments using exactly the same organizational scheme offered by plaintiff.

**I.     The Divorce Theory.**

Plaintiff did not include a separate stand-alone argument for this issue, although she clearly complained about it, but the Court believes it deserves its own heading. This theory (occasionally described under the broader label "social stressors") was a prominent and sweeping rationale. The ALJ immediately latched on to it. At the first hearing, the ALJ described it as the "prevailing" theme emerging from the record. R. 41. It was cited repeatedly in both decisions to rebut contrary lines of evidence.[2] The implicit assumption underlying this theory is that plaintiff's condition would improve once she got past the divorce.

---

[2] *See, e.g.,* R. 890 ("there were clear social stressors affecting the claimant's functioning at this time"); R. 903 ("still dealing with traumatic stuff related to divorce and her moods were up and down"); *id.* ("she continued to report

As noted above, one possible source for this theory was the statement in Dr. Harris's 2014 report quoted above. Another source was the treatment notes from Dr. Geiger and therapist Benedict. In the ALJ's view, plaintiff's divorce was the main topic discussed in her visits with these treatment providers. The ALJ also seemed to believe that plaintiff had suspiciously denied that her divorce was a cause of her problems. Specifically, the ALJ made the following claim:

> Although during her consultative psychological evaluation and at the hearing, the claimant stated that her divorce has not had a significant effect on her mental health and ability to function, the progress notes from her psychiatrist, Marianne Geiger, M.D., and Jan Benedict, LSW, *reveal otherwise*.

R. 893 (emphasis added).[3]

It would not be proper for this Court to declare this theory to be either right or wrong. It is possible that it will eventually be substantiated, but as now articulated, it raises several concerns. The first is that it is a layperson analysis. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs should "rely on expert opinions instead of determining the significance of particular medical findings themselves"). It is true that Dr. Harris's report arguably alludes to this rationale, but Dr. Harris never explicitly or fully endorsed it. Nor did any other doctor insofar as this Court can tell. Moreover, but Dr. Geiger specifically rejected this theory in her August 2016 post-hearing letter, which stated among other points the following:

> The [ALJ's decision] also appears to focus on the impact of Krista's impending divorce on her emotional health. Of course, the end of a marriage is a stressful circumstance. However, Krista has presented with similar symptomology throughout her history treatment.

R. 843. This letter is unusual in that Dr. Geiger was responding directly back to the ALJ. The communication pathway between treating physicians and the ALJ is typically a one-way,

---

significant social stressors related to divorce and money"); *see also* R. 22 (finding that plaintiff's "treatment for depression over the past few years since the amended onset date was related more to her situation in separating and divorcing her husband and all of the disruption that this brought to her life, as well as her son's life").

[3] This sentence is a verbatim copy of a sentence from the first decision. *See* R. 20-21.

downhill street without this kind of rebuttal. Dr. Geiger offered a straightforward argument. She had been treating plaintiff before the divorce and therefore believed she could separate out its effects from the underlying illness. To state the obvious, Dr. Geiger is a medical expert trained to assess this type of question, and the ALJ is not. The task of disentangling two similar causal explanations is a difficult one, as the ALJ himself recognized at the first hearing. *See* R. 41 (observing that is "sometimes very difficult to separate" out these two theories). The Seventh Circuit has also cautioned ALJs in considering similar causal questions especially when a claimant has a mental illness. *See, e.g., Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).

But in addition to the doctor playing, the ALJ's reliance on the divorce theory suffers from the fact that the ALJ never confronted the counterargument set forth in Dr. Geiger's letter.[4] The Government also failed to address this argument. Under the basic principle that the ALJ must address contrary lines of evidence, this failure supports a remand.

The second concern with the ALJ's reliance on the divorce theory is that the ALJ, in the portion of quoted above, suggested plaintiff was being evasive in denying this theory. But this accusation falls apart if Dr. Geiger's letter is credited. Dr. Geiger explained that, even though her notes did indicate that the divorce had been a subject of discussion, she still believed in her professional judgment that it was not the deeper cause of the problems. If true, then plaintiff's testimony is not at odds with Dr. Geiger's notes. The ALJ portrayed plaintiff's testimony in black-and-white terms, stating that she had testified that her divorce did not have a "significant effect" on her mental health. But plaintiff's testimony was more nuanced. Here is what she stated: "I don't think that the divorce itself has the impact on my mental condition [] *as many*

---

[4] Later in the decision, the ALJ briefly summarized the contents of the letter, but offered no explanation for why it was wrong. R. 904-05. It may be possible that an expert could find flaws with Dr. Geiger's reasoning. For example, plaintiff was able to work up until 2006 despite having been treated by Dr. Geiger since 2001. But this all another reason why an expert should be called on remand.

*would think*. I think getting out of the situation that I was in, *has helped*." R. 41 (emphasis added). She did not deny that the divorce had an effect on her; rather, she was denying the ALJ's stronger claim that it was the primary explanation for her problems. In sum, the Court finds that a remand is required so that more analysis and expertise can be provided to either bolster or refute the ALJ's divorce theory.

## II.    Dr. Geiger's Opinions.

A separate basis for remand is plaintiff's argument that the ALJ did not fully consider the relevant issues in rejecting Dr. Geiger's opinions.[5] Dr. Geiger completed several similar RFC questionnaires for both the first and second rounds of administrative proceedings. *See* Exs. 9F (May 12, 2015); 14F (March 24, 2016); 15F (August 31, 2016); 25F (January 9, 2018). These questionnaires asked her opinion on a number of topics. The ALJ summarized these findings accurately. They include, to note few, that plaintiff could not sustain concentration for more than two hours at a time and that she would miss four or more days a month.

Plaintiff complains that the ALJ failed to explicitly follow the checklist under the treating physician rule. This is true, and it adds to the list of reasons why a remand is warranted. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). For example, if the checklist had been applied, then ALJ would have had to give some acknowledgment and weight to the length and nature of plaintiff's treatment relationship with Dr. Geiger. As plaintiff emphasizes, the relationship spanned over 17 years, albeit with some gaps. To put that in perspective, the relationship covered most of the two terms of President Bush, both terms of President Obama, and at least one year into the term of President Trump. Although the ALJ

---

[5] The ALJ did not discuss the divorce theory in this portion of the decision, but an argument could be made that it played a role here too.

referred briefly to the length of this relationship, it is not clear whether the ALJ gave it any real weight to it in the analysis.

Even if we looked past the checklist argument and considered the ALJ's rationales on their own, we would still remand. The ALJ relied on the following rationales: (1) Dr. Geiger wrongly found there were four episodes of decompensation; (2) Dr. Geiger's opinions were inconsistent with certain daily activities; (3) Dr. Geiger's opinions were inconsistent with treatment notes; and (4) Dr. Geiger's opinions were inconsistent with the two consultative examiners and the state agency physicians.

One general point, applicable to several rationales, should be mentioned at the outset. At its core, the ALJ's analysis rested on the broader claim that Dr. Geiger portrayed plaintiff as being incapable of almost any activity, an arguably extreme portrayal at odds with facts showing she could do at least a limited range of activities. However, a question exists as to whether the ALJ created a strawman. Relevant to this question, the Court notes that both the ALJ and the Government have used the phrase "no useful ability to function" when describing Dr. Geiger's findings. *See, e.g.*, R. 896; Dkt. #26 at 8, 10, 11. This phrase comes from the RFC questionnaire. It was the most limiting rating category that the person completing the form could choose. Dr. Geiger did rate some of plaintiff's abilities in certain areas as falling in this category, but in many other areas, she rated plaintiff's abilities as being less limited. This point aside, the Court notes that the questionnaire indicated in the instructions that the person completing the form was being asked to assess the claimant's ability to do "work-related activities on a day-to-day basis in a regular work setting" and further defined the specific phrase "no useful ability to function" to mean that the claimant "cannot perform this activity *in a regular work* setting." R. 632 (emphasis added). Thus, this phrase was not referring to a general ability to function in the home, according

to a more leisurely schedule. Under the more demanding definition used on the questionnaire, a person might be found to have no useful ability to do work tasks continuously in a full-time job, even though that person could still do some household tasks.[6]

As for the specific rationales, the first one was about possible episodes of decompensation. The ALJ concluded that Dr. Geiger was wrong in believing there were four because plaintiff "has not had any hospitalizations." R. 896. The ALJ seemed to believe this was an open and shut point as there is little discussion about it. But even though the particular fact underlying this argument (no hospitalizations) is accurate, the legal premise is wrong. As plaintiff explained in her opening brief, being hospitalized is not the only way to establish an episode of decompensation. A claimant may also meet this definition by showing that there was a "significant alteration in medication." Dkt. #21 at 10. To prove this point, plaintiff in her opening brief cited to and quoted liberally from *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) ("An incident—such as hospitalization or placement in a halfway house—that signals the need for a more structured psychological support system would qualify as an episode of decompensation, 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00, but so would many other scenarios."). In addition, the RFC questionnaires themselves included two asterisk explanations of what can qualify as an episode of decompensation, and neither refers to hospitalizations, much less imposes a rigid requirement. *See, e.g.*, R. 634.[7]

After establishing this legal proposition, plaintiff then argued that she had several significant alterations in medication between 2015 and 2016. *See* Dkt. #21 at 10 ("first Wellbutrin was restarted (R. 818) then Lorazepam increased (R. 809) then Abilify started (R.

---

[6] This is another example of the Administration failing to follow its own forms, rules, regulations, and rulings. This occurs all too often.
[7] *See* footnote 6 *supra*.

803) then Saphris started"). The ALJ never addressed these arguments and stuck to the no-hospitalization rationale.[8] At this point, we are not assessing directly whether plaintiff ultimately did or did not have four episodes of decompensation, as Dr. Geiger contended, but are looking instead at whether the ALJ was justified in downgrading Dr. Geiger's credibility based on this point. Although the decompensation issue is arguably not as important as some other issues, the ALJ's attempt to use this supposed error to discredit Dr. Geiger is based on legal error.

The ALJ's second rationale is that Dr. Geiger's opinions were contradicted by plaintiff's (i) "ability to maintain her home with her son" and (ii) her ability to "attend college classes where she earned As and Bs." R. 896. We have already discussed the general issue of household activities somewhat in the discussion of "no useful ability to function."

As for maintaining a home and taking care of her son, plaintiff emphasizes that her parents helped her with these tasks, coming over several times a week, and she also points out that she had the freedom at home to do activities on her own schedule, in accordance with her fluctuating symptoms. It is not clear that the ALJ gave consideration to these facts and to the well-recognized difference between home chores and work tasks. *See Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016) (remanding because the ALJ's credibility determination "failed to acknowledge and account for those crucial differences" between home and work tasks).

One of plaintiff's main contentions is that her mental problems prevented her from *sustained* focus and concentration. Even if she could do some short-term tasks, she claims that she lacked consistent follow through. The ALJ's analysis failed to distinguish between these two

---

[8] After plaintiff raised this argument and cited to *Larson*, the Government in its brief ignored the topic, making no attempt to distinguish *Larson* and not even mentioning it. Instead, the Government just reasserted the same point the ALJ originally made. *See* Dkt. #26 at 9 ("Despite Dr. Geiger's opinion that plaintiff experienced four or more episodes of decompensation, the record does not show that plaintiff had any hospitalizations resulting from her mental impairments."). This double-down approach is not a winning strategy.

aspects of concentration. An example is the following statement: "[S]he indicated a short ability to pay attention, but was again reportedly able to do laundry[.]" R. 892 (citations omitted). But this argument fails to confront the sustained concentration allegation. It is not obvious that doing laundry, under a flexible schedule, requires the kind of sustained concentration needed to process widgets eight hours a day. If a person forgets to promptly move the clothes from the washer to the dryer, there is no great harm all things considered. Plaintiff testified that she had "double-check" things often when doing these types of tasks.

As for the ALJ's plaintiff's ability to complete some but not all of her online courses, this rationale is the stronger of the two and is one the ALJ was entitled to rely on as part of a broader analysis. However, there is again a concern about flexible scheduling and sustained concentration. The facts need to be clarified more about the frequency of plaintiff's reading and study time. Finally, there is also an issue about whether doing this type of work should be equated with doing only simple tasks, as the ALJ's RFC contemplates. Plaintiff testified that she would find it difficult doing a job where the simple tasks would be "monotonous" and "boring." R. 859. Plaintiff's mere say-so on this point is not necessarily definitive, and it is likely that many employees could make a similar statement about boring tasks, but the ALJ still should address this general issue of sustained concentration with more care and in consultation with an expert. This analysis will also be applicable to plaintiff's argument that the ALJ erred in evaluating the requirements of Listing 12.04.

The ALJ's third rationale—that Dr. Geiger's conclusions were inconsistent with the treatment notes—is potentially a much stronger rationale than the first two because it goes to the heart of the treating physician rule (supportability and consistency). The issue here is cherrypicking. The ALJ cited to two examples (and perhaps a third one later on) to support this

claim. *See* R. 897. The concern about cherrypicking is not directly in the first instance about whether two (or three) examples represent a fair sample size. Rather it is that the cherrypicking occurred within the confines of a single document.

Because all three examples suffer from this same problem, only one of them will be discussed. Here is the first alleged inconsistency cited by the ALJ:

> [O]n February 2016, between [Dr. Geiger's] two opinions, the claimant was neat and clean, and was attentive and cooperative (13F/2). The claimant's speech and behavior were normal, although her mood was depressed and frustrated, and her affect was tearful. Nevertheless, the claimant's perception was normal, her thought process logical and goal-oriented, and her thought content was rationale. Moreover, the claimant's impulse control was normal, and her judgment, insight, and reliability were good (13F/2-3).

R. 897. This paragraph relies on the mental status exam portion of this treatment note. Set forth below is a screenshot of it:

**Mental Status Exam**: .
Appearance: Neat and clean
Gait: Normal
Attention & Attitude Toward Examiner: Attentive and Cooperative
Speech: Normal Rate and Rhythm
Behavior/Psychomotor: Within Norms
Mood: depressed, frustrated
Affect: tearful
Perception: Normal
Thought Process: Logical and Goal-directed
Thought Content: Rational
Suicidal/Homicidal Thoughts: No Suicidal / Homicidal ideation
Suicide Risk Eval: G8932
Sensorium & Cognition: intact
Impulse Control: normal
Judgment: good

R. 787. Preliminarily, one could question whether this mixed bag of findings is even inconsistent with Dr. Geiger's overall findings or with plaintiff's testimony. Although there are some normal findings (*e.g.* "neat and clean"), there is also a finding that plaintiff was "depressed" and "frustrated" and "tearful." Perhaps these findings might be used to show that plaintiff was not

experiencing an extreme episode of decompensation on this particular day, but they do not clearly rebut many of plaintiff's claims including the key assertion that she could not engage in sustained concentration and that her symptoms fluctuated. But this is not the part most vulnerable to the cherrypicking criticism in this Court's view. It the fact that the ALJ never acknowledged other portions of these same notes. For example, consider the following:

> **Chief complaint:** This is a 43 year old female for discussion of the following: Pt mood down, tearful at times. Pt reports she is not taking Saphris after trying it for 2 weeks. Med helped her sleep, but energy and mood went down significantly, so she stopped. Will let Dr. G. know. Pt sleeping 3-4 hours per night. Pt unable to exercise due to knee and hip pain. Will see therapist for knee/hip next week. Pt discussed adjustment to recent changes: living in apt. with son, husband on worker's comp, no monetary support coming in. Pt tired of divorce dragging out, told it will probably take over another year to resolve. Pt continues to attend school, dropped one class. Disability hearing end of March. Providing meditation CD's for Managing Anxiety and Healthful Sleep.

R. 786. This passage paints a much different picture than the rosier assessment given by the ALJ. When this portion of the notes is considered alongside the mental status exam, it is much less clear that these notes are inconsistent with Dr. Geiger's opinions. The ALJ should have acknowledged this evidence. The Seventh Circuit has criticized this very type of cherrypicking. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("The ALJ considered only the signs of possible improvements in these notes and ignored the negative findings. But all findings in psychiatric notes must be considered, even if they were based on the patient's own account of her mental symptoms.") (internal citations omitted).

The Court notes one additional concern, perhaps it is more of a question, about the ALJ's reliance on these mental status exams. In the example quoted in the above paragraph, and also in a number of other places, the ALJ suggested that a finding of, for example, "logical thought" was inconsistent with a finding of, for example, a "depressed mood." But it is not clear whether it is appropriate to compare cognitive and affective functions in this either-or manner. Are these two

states (logical thought and depressed mood) preclusive of each other? The ALJ's decision rests on the premise that they are. The ALJ should address this question on remand because it might affect the type of medical findings deemed as appropriate evidence for various impairments and limitations. A medical expert could speak to this issue with more authority.

As for the ALJ's fourth rationale, which was that Dr. Geiger's opinions were at odds with the two State agency physicians and with the two consultative examinations, the Court finds that it is hard to understand clearly. This fact may be due, in part, to the wide variance in these opinions and the ALJ's decision not to credit any of them fully. As the ALJ noted, there was an "immense discrepancy" between the many medical opinions on record. R. 897. But rather than using this discrepancy as a justification for engaging in a layperson analysis, the better approach would have been to call a medical expert at the hearing to help resolve these divergent opinions, just as the Appeals Council's remand order suggested.

## III. Remaining Arguments.

The Court finds that the above arguments are sufficient to justify a remand. Plaintiff raises a few more arguments, but given that we have already concluded a remand is justified, there is less benefit in discussing these at length or at all.

In a one-paragraph argument, plaintiff argues that the ALJ erred in rejecting evidence of crying episodes. Plaintiff cites to numerous places in the record where she reported these episodes. The Government responds with its own short rebuttal. It notes that plaintiff's "affect varied," meaning she wasn't crying all the time, and argues that "despite being tearful— [plaintiff] consistently had a logical and goal-directed thought process, rational thought content, normal impulse control, and intact sensorium and cognition." Dkt. #26 at 12. This argument again raises the issue about whether these two components—logical thought and crying—are

necessarily inconsistent. Moreover, this argument turns on the separate credibility assessment. In any event, the ALJ should specifically address these arguments on remand.

Plaintiff also raised various criticisms about the credibility analysis. Some of them—such as the overweighting of daily activities, the divorce, and the problem with sustained concentration—have been discussed already. But one credibility rationale not previously mentioned is a statement plaintiff made to her therapist that she was going to interview for a position at her son's school. The ALJ mentioned this fact several times, and seemed to place weight on it, although it is not clear how much. *See* R. 894 ("claimant showed some enthusiasm for the prospect"); *id.* ("started looking for job opportunities"); *id.* ("the claimant began to focus on her future, as she has interviewed for a position at her son's school"). The Government takes the position that this fact was significant. *See* Dkt. #26 at 13 ("Plaintiff's credibility deteriorated further due to her inconsistent statements. *Significantly*, in May 2014, plaintiff interviewed for a position at her son's school.") (emphasis added).

But this rationale rests on a vague foundation. As for the facts, the ALJ relied on the following:

> **Chief complaint:** marital issues, depression, insomnia
>
> This is a 41 year old female who presents For Discussion of the Following: Pt reports she is sleeping approximately 4 hours per night, feeling very fatigued in session. Pt provides information regarding negotiations for divorce. Pt and husband are communicating, but pt states she cries throughout. Pt continues to indicate she is unable to forgive husband for past issues, and divorce is only solution. Provided Claudia Black's material on forgiveness for pt to review. Pt brought her mother's log of past behavior disturbances for file. Pt appears to try to get herself focused on the future and has interviewed for portion at son's school. Pt shows some enthusiasm for the prospect.

R. 447 (yellow highlighting added by the Court). There is not a lot of detail in this statement about the nature of this job. It is not clear, for example, whether it might have been a part-time or seasonal position. But plaintiff's general desire to eventually work was a fact she did not try to hide. *See* R. 63 (plaintiff: "I would like to think that one day I would be able to go back to work,

whether it's only part-time or something."); R. 843 (Dr. Geiger: "we remain hopeful that her mood will stabilize so she can function more fully and consistently in the future").

Turning back to this particular school job, the ALJ also did not consider the possibility that plaintiff was not being realistic in believing she could handle a full-time job, assuming it was a full-time job. After the Government relied on this attempt to work in its brief, plaintiff in her reply cited to *Ghiselli*, where the Seventh Circuit stated the following: "Persisting in looking for employment even while claiming to suffer from a painful disability might simply indicate a strong work ethic or overly-optimistic outlook rather than an exaggerated condition." 837 F.3d at 778. On remand, this question should be analyzed in more depth, keeping this principle from *Ghiselli* in mind.

To the extent that there are other arguments this Court has not addressed, plaintiff's counsel should specifically raise them with the ALJ on remand, both in a pre-hearing letter brief and at the hearing itself. To the extent that there is a third appeal, this Court will give more weight to those arguments plaintiff has raised explicitly and forcefully to the ALJ. It is not clear at this point whether plaintiff will ultimately prevail in her disability claim, but she has provided sufficient arguments to warrant a remand. On remand, the ALJ must call a medical expert to testify about the psychological issues mentioned in this opinion and any other issues that are relevant. We have noted several issues, but to add one more, the record is mixed on whether plaintiff suffered from bipolar disorder. Dr. Geiger believed that she did, but psychologists Harris and Thomas did not. The ALJ also should consider whether to call a separate expert to testify about plaintiff's fibromyalgia. Plaintiff testified that this problem was less paramount than her mental impairments, but she still referred to a vicious cycle in which the pain from the fibromyalgia caused a lack of sleep which fed back into the mental problems. The ALJ should

19

address this argument and should consider the possible cumulative impact from all the impairments. The Court recognizes that the issues presented in this case are not easy to resolve, particularly given the nature of impairments like fibromyalgia.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: June 10, 2020                    By: _____
                                            Iain D. Johnston
                                            United States Magistrate Judge